UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION NO. |
| | : | 3:18-CR-00181 (JCH) |
| v. | : | |
| | : | |
| TIMOTHY CHARLEMAGNE | : | |
| Defendant. | : | MAY 6, 2022 |
| | : | |

**RULING ON DEFENDANT'S EMERGENCY MOTION FOR REDUCTION IN SENTENCE (DOC. NO. 84)**

**I.   INTRODUCTION**

On October 29, 2020, this court sentenced defendant Timothy Charlemagne to 41 months in prison following his plea of guilty to possession with intent to distribute, and distribution of, heroin and fentanyl.  See Judgment at 1 (Doc. No. 78).  In imposing the sentence, the court recommended that Mr. Charlemagne be "housed at a facility that accounts for his medical conditions."  Id. at 2.  In particular, the court was concerned with his diabetes and a letter that Mr. Charlemagne's podiatrist had written in advance of sentencing, where she warned that he suffered from "chronic ulcerations under both of his feet and at the ends of both his big toes that require . . . [debridement] of the wounds every 3-4 weeks."  Letter from Lynn M LeBlanc, DPM, Def.'s Ex. C (Doc. No. 73-3).  The podiatrist cautioned that failure to continue this course of treatment "could leave him susceptible to amputation moving forward."  Id.  A copy of that letter was part of the record that was sent to the Bureau of Prisons (BOP), but the court's recommendation was not heeded.

The warning from Mr. Charlemagne's podiatrist proved prescient.  Since Mr. Charlemagne's self-surrender to the BOP on February 28, 2021, the BOP has failed to

1

treat his conditions appropriately at every step of the way. See Order (Doc. No. 83). On February 22, 2022, following the development of gangrene in his right foot, the toes on that foot had to be amputated. In light of: (1) the fact that the BOP has repeatedly demonstrated its inability to provide adequate medical care for Mr. Charlemagne and (2) the court's consideration of the applicable section 3553(a) factors below, the Motion is granted.

## II.     BACKGROUND

Following the amputation of the toes on his right foot, Mr. Charlemagne filed the instant Emergency Motion to Reduce his Sentence – colloquially referred to as a Motion for Compassionate Release – on April 21, 2022. See Emergency Mot. for Reduction in Sentence (Doc. No. 84); Mem. in Supp. of Emergency Mot. for Reduction in Sentence (Def.'s Mem.) (Doc. No. 84-1).  The Government responded two days later, opposing his Motion.[1]  See Gov't's Resp. to Def.'s Emergency Mot. for Reduction in Sentence (Gov't's Mem.) (Doc. No. 90).  Over the course of the following two weeks, the court held a telephonic conference and a hearing on the Motion. See Minute Entry (Doc. No. 93); Notice (Doc. No. 94).  In addition, the Government filed over 1,000 pages of medical records under seal. See Medical Records (Docs. No. 88, 92-1).

Given the exigent nature of Mr. Charlemagne's Motion, the court otherwise assumes familiarity with the facts of this case and outlines them below in Section IV only as necessary to articulate its Ruling.

---

[1] The court wishes to express its appreciation to Government's counsel for her substantial efforts to obtain records and communicate with the BOP concerning Mr. Charlemagne's condition, treatment, and possible transfer.

**III.     STANDARD OF REVIEW**

Pursuant to section 3582(c)(1)(A)(i) of title 18 of the United States Code, a court may not modify a term of imprisonment "once it has been imposed" except in a case where, after exhaustion of administrative rights,[2] the court considers the applicable section 3553(a) factors and finds that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). In United States v. Brooker, 976 F.3d 228 (2d Cir. 2020), the Second Circuit held that the guideline provisions applicable to compassionate release motions did not apply to motions brought in court by an inmate following a denial by the BOP of a compassionate release request. "In other words, if a compassionate release motion is not brought by the [BOP], Guideline § 1B1.13 does not, by its own terms, apply to [the prisoner's motion in court]. Because Guideline § 1B1.13 is not 'applicable' to compassionate release motions brought by defendants, Application Note 1(D) cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling." Id. at 236.

**IV.     DISCUSSION**

    A.     Extraordinary and Compelling Reasons

Extraordinary and compelling reasons clearly exist to warrant a reduction in Mr. Charlemagne's sentence. Indeed, the record before the court demonstrates that Mr. Charlemagne has received inadequate care for his serious medical conditions since the day he began his period of incarceration. At the hearing, Attorney Ward represented to the court that, after Mr. Charlemagne was designated, he reached out to the facility to

---

[2] The parties do not dispute that Mr. Charlemagne has exhausted his administrative remedies in this case. See Def.'s Mem. at 7 (citing Def.'s Ex. 5); Gov't's Mem. at 3.

3

ensure they would be able to adequately account for his numerous conditions.[3] According to him, they were unresponsive. Nor do the medical records in this case reveal anything close to the level of care recommended by his podiatrist at sentencing. For instance, on April 30, 2021 – two months after he went into BOP custody – a podiatry consultation and evaluation was requested. See Medical Records at 147 (Doc. No. 88). The requested consult was to consider "possible recommendations on footware due to high risk inmate." Id. The request was marked as "[r]outine", and the scheduled target date for the evaluation was listed as three months later – July 30, 2021. Id. Yet, at the hearing, both Attorney Ward and Attorney Kaoutzanis agreed that the evaluation appears never to have happened. What is more, the record reveals – and the Government does not dispute – that Mr. Charlemagne did not see a podiatrist during the entire year he was incarcerated, before his toes were amputated. Stated simply, the BOP was aware of his condition and aware of the urgency it presented. Still, he was not adequately treated.

To be sure, he was given some care – though it was far short of the "debridement . . . of [his] wounds every 3-4 weeks" his podiatrist had warned was necessary to avoid amputation. Letter from Lynn M LeBlanc, DPM. There is evidence that the wounds on his feet were cleaned in April and May of 2021. See Medical Records at 112, 116, 118, 120 (Doc. No. 88). However, Mr. Charlemagne's medical providers were not debriding the wounds and, in November 2021, he complained about

---

[3] Mr. Charlemagne suffers from "uncontrolled" Type 2 diabetes, as well as high blood pressure and morbid obesity. See Medical Declaration by Nashley Harrigan, MD, Def.'s Ex. D at ¶ 12 (Doc. No. 86). While incarcerated, he has received counseling on eating. However, he does not appear to have had a diabetic meal plan. Further, while out of the BOP facility – at the hospital for amputation and at the rehabilitation center afterwards – he was placed on a different diabetes medication which he reports lowered his very high A1C. That medication appears to have stopped upon his return to Schuylkill.

the pain in his feet and explicitly told the medical provider that he had seen "a podiatrist on the street and they had special tools they would use to shave my callouses with." Id. at 59. Mr. Charlemagne went on to ask if he could be "seen by a podiatrist [at the facility] to shave [his] callouses on both feet. Id. That request was ignored.

The record does indicate that he had some foot care in December and into January. Id. at 31, 53-54. This included removal of the "[c]alloused tissue" on his feet "with scissors." Id. at 31. Still, his wounds were "getting worse" and, on February 16, 2022, the ulcers had gotten so bad that he had to be taken to the Emergency Department of an outside hospital with gangrene. Def.'s Mem. at 3. The amputation procedure followed, on February 22. Def.'s Ex. C at 126 (Doc. No. 86).

The parties represented at the hearing that Mr. Charlemagne was transferred to a rehabilitation facility shortly after the procedure and, in late April, returned to Schuylkill. See Medical Records at 5 (Doc. No. 92-1). Still – despite all he has been through and the risk of further harm to his feet – "no recommendations for [a] [p]odiatry consult have been made by Mr. Charlemagne's surgical or physical therapy team." Email from AUSA Kaoutzanis re Defendant's BOP/Medical Status, Sealed Court Ex. 1 (Doc. No. 96). The Government has represented that he is currently fourth in line for a bed at FMC Devens, and that the capacity to provide him care at that facility is substantially higher than it is at Schuylkill. Still, the Government is unable to say when Mr. Charlemagne will be moved and, because the medical team there has not yet reviewed his file, there is no plan of treatment in place for when he is transferred.

Taken together, even if Mr. Charlemagne were to be transferred to Devens today, the court would still conclude that extraordinary and compelling circumstances

exist that would warrant a reduction in his sentence. The court has meticulously reviewed the voluminous records from Mr. Charlemagne's first year plus in custody. It is a substantial understatement to say that "Mr. Charlemagne's medical problems [have thus far been] poorly optimized while incarcerated." See Medical Declaration by Nashley Harrigan, MD, Def.'s Ex. D at ¶ 13 (Doc. No. 86). As Dr. Harrigan opined, "[f]oot ulceration is a preventable condition, where simple interventions can reduce amputations. Multiple interventions are typically required to effectively heal a diabetic foot ulcer, including local wound management, infection management, revascularization, and pressure offloading." Id. at ¶ 15.

Further, the failure to provide adequate and proper care that led to the February amputation has now increased his risk of further amputation. Dr. Harrigan averred that "[o]ne of the strongest risk factors of developing a diabetic foot ulcer is having a previous ulcer, having osteomyelitis and having previous amputations, amongst other things." Id. at ¶ 14. She further observed that Mr. Charlemagne's "comorbidities put[ ] him at an increased risk for further amputations while incarcerated without proper wound care and strict medical management of his comorbidities . . . . He has not received adequate monitoring of his diabetes, his high blood pressure, or had proper post-amputation follow up. Without strict medical management of his comorbidities and attentive, frequent wound care, he would likely develop recurrent foot ulcers leading to further amputations and possible severe infections." Id. at ¶ 9.

The BOP has failed to provide Mr. Charlemagne with adequate care up to this point. Indeed, it seems unable to do so. While Devens may, and likely will, provide more care, there is nothing in the record to indicate that it will be up to the task now that

his needs are even greater. Moreover, he has not yet been transferred to Devens, and the Government has been unable to provide the court with a timeframe for when that will occur.

For these reasons, the court concludes that extraordinary and compelling circumstances exist to reduce Mr. Charlemagne's sentence.  Next, it turns to consider the section 3553(a) factors relevant here.

  B. <u>Section 3553(a) Factors</u>

Even if a court finds extraordinary and compelling reasons, it must still consider the applicable section 3553(a) factors before granting a motion for compassionate release.  Here, the court has considered each of those factors and, for the reasons set forth below, concludes that, on balance, they warrant a reduction in Mr. Charlemagne's sentence.  The consequence of Mr. Charlemagne's offense was tragic, and the court is well aware of the letter and testimony from the victim's mother in response to this Motion.  Indeed, the court considered that impact in imposing the initial sentence in 2020.

Mr. Charlemagne's rehabilitation has been noteworthy.  Prior to being sentenced, he successfully completed Support Court.  He was drug free for nearly three years in the community while on pretrial release.  Def.'s Mem. at 15.  While incarcerated, he was on track to complete the BOP's Residential Drug Abuse Program (RDAP) before unaddressed consequences from his medical issues incapacitated him.  Had he completed RDAP, his release date would have moved forward to August 2022, approximately three months from the date of this Ruling.  Thus, although the nature and circumstances of the offense are serious, the history and characteristics of Mr. Charlemagne in the time since have been laudable.

Moreover, the court does not find that further incarceration will serve to promote any of the factors listed in section 3553(a)(2).  Mr. Charlemagne's time in BOP custody has been difficult.  He has not been provided with the medical care he requires and, as a result, has lost part of his right foot and is now at risk for even greater amputations.  The court previously determined that 41 months constituted just punishment for his offense and, assuming he would have completed the RDAP program, he would have completed that sentence just over three months from now.

Given the medical ordeal he has been through, the court concludes that Mr. Charlemagne's sentence – as it has actually been served – promotes respect for the law and reflects the seriousness his offense.  In addition, both the need to provide deterrence and the need to protect the public here is low, given Mr. Charlemagne's rehabilitation and his physical limitations following the amputation.  Finally, the court heavily weighs the final factor in paragraph (2) – the need to provide the defendant with needed medical care "in the most effective manner" – and concludes that granting Mr. Charlemagne's Motion is the only way to ensure he is provided with the medical care he needs.  He has support in his community and medical providers familiar with his condition.

## V.   CONCLUSION

For the reasons discussed above, the court grants Mr. Charlemagne's Emergency Motion for Reduction in Sentence (Doc. No. 84).  He shall be released from custody, and all conditions in the original Judgment are reimposed.

Upon release from custody, he shall also be placed on home detention with location monitoring for an additional period of nine months. The technology used to monitor this condition shall be at the discretion of the Probation Office. Mr.

Charlemagne must follow all rules and regulations of the location monitoring program. He must also pay all or a portion of the costs associated with location monitoring, based on his ability to pay as recommended by the Probation Office and approved by the Court.

**SO ORDERED.**

Dated at New Haven, Connecticut this 6th day of May 2022.

                                              /s/ Janet C. Hall
                                              Janet C. Hall
                                              United States District Judge